IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANA MARIE SHANK, | ) | Case No. 1:24-CV-02179 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Dana Marie Shank ("Shank"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Shank's application for DIB be affirmed.

## II.     Procedural History

Shank filed for DIB on April 28, 2021, alleging a disability onset date of June 1, 2011. (Tr. 341-44). Shank last met the insured status requirements of the Social Security on December 31, 2012. (Tr. 92). The claims were denied initially and on reconsideration. (Tr. 117-18, 123-24). She then requested a hearing before an ALJ. (Tr. 128-29). Shank, represented by counsel, and a

vocational expert ("VE") testified before the ALJ on September 8, 2023. (Tr. 25-70). On October 4, 2023, the ALJ issued a written decision finding Shank not disabled. (Tr. 92-103). The Appeals Council denied her request for review on October 17, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 3-5; see 20 C.F.R. §§ 404.955, 404.981). Shank timely filed this action on December 16, 2024. (ECF Doc. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Shank was 38 years old on her date last insured, making her a younger individual according to Agency regulations. (*See* Tr. 101). She graduated from high school. (*See id.*). In the past, she worked as a registered nurse, DOT 075.364-010, medium, skilled, SVP 7; lecturer/visiting professor, DOT 090.227-018, light, skilled, SVP 8; nurse practitioner, DOT 075.264-010, light, skilled, SVP 8; research nurse, DOT 189.117-030, sedentary, performed at light, skilled, SVP 8; school nurse, DOT 075.124-010, light, skilled, SVP 7. (Tr. 58, 65).

#### B.    Relevant Medical Evidence[1]

Prior to the alleged onset date, on May 17, 2007, Shank presented to the Cleveland Clinic Foundation's Pain Management Center for an evaluation by Teresa Dews, M.D., for lower abdominal pain that began when she was 14 years old. (Tr. 3512). Shank described the pain as a "'raking sensation'" that did not radiate. (*Id.*). She reported that the pain was under control due to lack of menstruation from hormonal suppression. (*Id.*). The pain is precipitated by flexion and movement and relieved by ice, resting, and medication including NSAIDs and Vicodin. (*Id.*). She reported rarely using the Vicodin. (*Id.*). In the past, she treated with anesthesia nerve block,

---

[1] The record contains a significant amount of medical evidence post-DLI, however I focus my attention to the records pre-DLI given the arguments raised and the findings of the ALJ.

psychology/psychiatry, physical therapy, and medications. (*Id.*). The medication and nerve block resulted in partial relief while the physical therapy provided no relief. (*Id.*).

During the review of her systems, Shank reported no change in her bowel or bladder habits. (*Id.*). She was also negative for dysuria, frequency and incontinence. (*Id.*). Shank was assessed with chronic pelvic pain with a history of endometriosis with relief from hormonal suppression and embolization of the pelvic vein. (Tr. 3513). Dr. Dews noted that Shank had significant dysfunction related to her acute pain episodes and was vocationally impaired due to intermittent pain. (*Id.*). Dr. Dews' plan following this appointment included: diagnostic plexus block with local anesthetic, stop her oral contraceptive to have enough pain for the block, pain diary, and work with Pain Psych. (*Id.*). Shank was instructed to follow up in four to six weeks for the hypogastric pain block. (*Id.*).

Shank presented for a follow up appointment with Dr. Dews on August 2, 2007, reporting continued episodes of breakthrough pain. (Tr. 3515). At the time of this appointment, she had not been able to coordinate an appointment for the hypogastric pain block. (*Id.*). She had not started taking Kadian due to her concern that it was a sustained release medication but had taken three Vicodin when in pain, which had been effective. (*Id.*). Shank deferred a physical exam. (*Id.*). Dr. Dews' assessment included realigning expectations to explain that it was difficult to "catch" the pain at the appropriate intensity to perform the nerve block, and that Shank needed a more appropriate rescue pain medication regimen – one that did not include Vicodin – and better coping skills. (*Id.*).  Dr. Dews prescribed morphine sulfate. (*Id.*).

At a December 19, 2007 pain management follow up appointment with Dr. Dews, Shank reported that her medications were effective and causing sedation. (Tr. 3517). Her pain was reported at a zero on a ten-point scale, however during her menstrual cycle it was a nine out of

ten. (*Id.*). Dr. Dews noted that Shank had an ovarian vein embolectomy in November 2006. (*Id.*). After discussing that the nerve block would be for diagnostic purposes only, Shank reported that she would prefer that course of action over taking morphine for her pain. (*Id.*). Shank also reported being interested in a sacral neurectomy procedure with Dr. Falcone. (*Id.*).

On March 7, 2008, Shank reported that her symptoms had improved with addition of a Flector patch. (Tr. 3519). Her pain was less severe during her menstrual cycle and was managed with morphine as needed. (*Id.*).

At an August 14, 2008 appointment, Shank reported that she had stopped taking her prescribed medication due to dependency concerns. (Tr. 3521). She reported her medications were partially effective and causing abstinence syndrome. (*Id.*). Shank reported her pain being a four out of ten. (*Id.*). Shank expressed interest in a referral for an interventional radiology group in Columbus, Ohio for potential treatment for her pelvic congestion, however Dr. Dews deferred referral to Shank's primary care provider. (*Id.*).

On September 24, 2008, Shank called Dr. Dews' office stating she was having a hard time standing due to pain and asked whether she qualified for a wheelchair or other assistive device and a disability placard. (Tr. 3528). Dr. Dews agreed to give Shank a placard but declined a wheelchair. (*Id.*).

On November 21, 2008, Shank called Dr. Dews' office to asked if Dr. Dews would support her in applying for social security after her job description changed, making it more physically demanding. (Tr. 3533). Dr. Dews directed Shank to the Social Security office, instructed her to follow up with Dr. Mushkat, and stated she would sign paperwork that came through. (*Id.*).

At a December 11, 2008 appointment, Shank reported that her symptoms were persistent and her medication was partially effective and causing sedation. (Tr. 3534). She rated her current pain at a zero. (*Id.*). Dr. Dews no longer felt that the diagnostic block would be beneficial for diagnostic purposes, and further felt no role for therapeutic pain injections for Shank's pain distribution. (*Id.*).

On December 31, 2008, Shank presented for a "second opinion" appointment with Douglas E. Joseph, D.O. regarding right sided pelvic pain. (Tr. 4430). Shank reported a history of similar pain on the left side which she underwent embolization for on the left ovarian vein in November 2006. (*Id.*). Before the embolization she had severe left sided pelvic pain that radiated to her leg. (*Id.*). The pain was worse when upright and relieved by laying down. (*Id.*). The embolization completely resolved her symptoms. (*Id.*). Shank reported that the symptoms on her right side had been progressively worsening for three to four years and resembled that of her left side. (*Id.*). Further, symptoms were brought on by standing and were not cyclical. (*Id.*). Elevating her legs helped and she did that every day. (*Id.*). Dr. Joseph noted that Shank had no visible varicose veins and some spider veins in the legs but no bulging varicosities. (*Id.*). No stigmata of veinous disease were visible. (*Id.*).

Shank reported to Dr. Joseph that she was told that a 2006 CT scan demonstrated evidence of Nutcracker Syndrome, and had been diagnosed with meralgia paresthetica, pelvic congestion syndrome, focal adenomyosis and endometriosis. (*Id.*).

After visiting with Shank and reviewing her medical records, Dr. Joseph noted that a May 2008 CT scan showed reflux within the right ovarian vein and varices in the right adnexa. (Tr. 4434). According to Dr. Joseph, Shank's symptoms were consistent with pelvic congestion syndrome. (*Id.*). Dr. Joseph fitted and placed Shank in 20 to 30 mmHg pantyhose graduated

compression stockings to keep with a conservative approach to her symptoms. (*Id.*). Dr. Joseph also noted that a colleague – Dr. McLennan – agreed to meet with Shank to provide expert opinion on her diagnosis and treatment options. (*Id.*).

Shank reported no new complaints and rated her pain at zero on a ten-point scale at a January 4, 2011 appointment. (Tr. 3536, 4378). Dr. Dews noted satisfactory analgesia and functional status improvement. (*Id.*). Shank reported having no pain since the birth of her son. (*Id.*). Shank sought new prescriptions because all bottles she had were from 2008 (*Id.*). She was concerned that if her pain resurfaced, she could have difficulty reaching Dr. Dews' office for assistance. (*Id.*). Shank was scheduled for an MRI for a possible pelvic embolectomy. (*Id.*). While her pain was rated zero during this visit, Shank reported that her pain was aggravated by standing and alleviated with rest and lying supine. (Tr. 3539).

On January 28, 2011, Shank presented for an MR venogram of her pelvis due to complaints of unspecified site abdominal pain and notes of a history of possible pelvic veinous congestion. (Tr. 4377, 4387). The record also contains the radiological images taken at this visit. (Tr. 4361-75, 4612-4332). Amanjit Gill, M.D. interpreted the venogram and found that Shank's uterus was within normal limits with a normal junctional zone, there was no evidence of fibroids. (Tr. 4377). Physiological cysts were seen in bilateral ovaries. (*Id.*). There was no free fluid seen in the pouch of Douglas, and the left ovarian vein was not enlarged. (*Id.*). Dr. Gill noted that physiologic venous vasculature was noted in the parametrial regions. (*Id.*).

Shank presented to an April 7, 2011 gynecological appointment with Tommaso Falcone, M.D., complaining of bleeding and spotting since January 2011. (Tr. 3563). Upon examination, Dr. Tommaso noted there was no evidence of fibroids, but physiologic cysts were seen in bilateral ovaries. (*Id.*). The left ovarian vein was not enlarged but physiologic vasculature was

noted in the parametrial regions. (*Id.*). Notes indicate that Shank had complained of the following problems since 2006: abdominal pain, muscle weakness, muscle spasm, lumbosacral neuritis, and female genital symptoms. (Tr. 3566). Shank reported during this visit that she had recent pain within the last few weeks in her lower left abdomen that rated a three on a ten-point scale. (*Id.*). She described the pain as "pulling" and intermittent, lasting for a few seconds. (*Id.*). The pain was aggravated by certain movements and alleviated by nothing. (*Id.*).

On May 17, 2011, Shank presented for a psychiatric appointment with Robert Taylor Segraves, M.D., Ph.D. (Tr. 3567). Dr. Seagraves noted that Shank's treatment goal had an improved rating of depressed affect obtained by psychopharmacological management and supporting/abreactive psychotherapy. (*Id.*).

Shank presented for an appointment with endocrinologist Revital Gorodeski Baskin, M.D., at Cleveland Clinic, on May 23, 2011. (Tr. 3572). Dr. Gorodeski Baskin noted that Shank had a history of low phosphorus levels and recommended considering nephrology evaluation if the issue persisted. (*Id.*). Shank reported having irregular periods after her third pregnancy, but that her endometriosis pain was stable. (*Id.*). Dr. Gorodeski Baskin recommended that Shank follow up in six months. (*Id.*).

After the alleged onset date, the record includes an encounter for a nasal lesion on June 10, 2011 (Tr. 4389) as well as the results of a prick allergy test dated March 22, 2012 (Tr. 3573-75).

### C.    Medical Opinion Evidence

The record contains numerous medical opinion reports and consultative examination reports, however each of them were not given during the relevant period between June 1, 2011, and December 31, 2012. (*See* Tr. 3248-55, 3339-44, 3352, 3581-3602, 3917-60, 4198, 4200-01,

4203-4302, 4596, 4598). For example, an October 29, 2021 residual functional capacity assessment by Eamonn M. Quigley, M.D., states that the assessment was a current evaluation rather than one for the relevant time period. (Tr. 3248).

### D.     State Agency Reviewing Opinions

State agency reviewing physician Paul Sporn, M.D., reviewed Shank's medical record on December 2, 2021. (Tr. 77-81). Dr. Sporn opined that there was insufficient evidence prior to the DLI to establish disability and made no findings with respect to Shank's RFC. (Tr. 79-80). On April 18, 2022, Jeffrey Faludi, affirmed Dr. Sporn's opinion. (Tr. 83-88).

### E.     Administrative Hearing Evidence

At the outset of the hearing, the ALJ asked whether there were any objections to admitting the following exhibits into evidence: 1 through 4A, 1 through 38B, 1 though 16D, 1 through 43E, and 1 through 119F. (Tr. 28). No objections were lodged, and the exhibits were admitted into evidence. (Tr. 29).

When asked how Shank spent a typical day in 2012, she replied her son was three years old and she spent her day taking care of him. (Tr. 47). She claimed that "he was a pretty active boy" and that she would walk him to the park to let him play. (*Id.*). She recalled that her husband's job required him to travel so he did housework on the weekends when he was home, and they would cook meals together and grocery shop before he left. (*Id.*). At this time, Shank drove, did light grocery shopping, and light cleaning. (Tr. 47-48). Grocery shopping for heavy items or using a heavy vacuum were left for her husband. (Tr. 48). Regarding cooking, she was able to heat and serve dishes and peel potatoes but was unable to lift a turkey to cook it. (Tr. 50). Her children were expected to help with any cooking. (*Id.*). There were times she was in bed for

two weeks straight. (Tr. 48). Her mother, father, and brother would visit to help her occasionally. (*Id.*). She also had friends that would take her children to their activities. (*Id.*).

She explained that the family tried to contract out whatever they could during that time. They had premeasured meal kits delivered, cleaning services, and wash and fold laundry services. (Tr. 50). However, Shank testified she was capable of doing laundry at this time. (*Id.*).

Shank explained that she often had to travel for healthcare. (Tr. 48). She had to go to "extreme places" and had to leave for long periods of time. (*Id.*). She was taking 90 milligrams of morphine for pain, that she brought to Texas from Ohio when she moved. (Tr. 51). However, she took it sparingly because she could not find a pain doctor in Texas to prescribe it. (*Id.*). She did not use a walker, crutch, or cane to get around. (Tr. 52).

Shank has three children, aged 21, 19, and 13 at the time of the hearing. (Tr. 45). Shank testified that she was diagnosed with endometriosis and infertility. (Tr. 46). As a result, she struggled to maintain a pregnancy due to hormonal dysfunction. (*Id.*). She recalled that her last pregnancy, in 2009, made it really painful to stand because she only had treatment for her pelvic congestion syndrome on one side. (*Id.*). She recalled the doctor needing to push on her stomach to push the baby out due to her muscles being so tight and rigid. (*Id.*).

Shank testified that her diagnosis of pudendal neuralgia was confirmed after Dr. Echo performed surgery on her and "visualized the crushed nerve between the muscle fibers and skeletal tissue." (Tr. 32). While she confirmed that she received the diagnosis within the five years prior to the hearing, that "the condition started way prior to that . . . ." (*Id.*). She claimed that it was not properly diagnosed earlier "because nobody looked." (Tr. 33).

As a result of the pudendal neuralgia, Shank suffers from chronic pain. (*Id.*). Due to the pain, she does not behave normally because of the mental and physical exhaustion it causes.

(*Id.*). She also struggles with moving. (*Id.*). According to Shank, she cannot take "a large amount of medication that helps because the side effects are too unbearable." (*Id.*).

Further, Shank was diagnosed with complex regional pain syndrome "about a decade" after symptoms onset. (Tr. 35). She estimated that the diagnosis was made in 2017 or 2018 by Dr. Huss, and he was not able to diagnose her until he had been treating her for approximately six months. (*Id.*). Dr. Huss confirmed the diagnosis of complex regional pain syndrome after placement of a spinal cord stimulator. (*Id.*).

Prior to her inability to work, Shank was a women's health clinical nurse practitioner. (Tr. 36). However, she had to leave this job in 2006 due to pain. (*Id.*). Her next job was a research nurse, which she described as a desk job in an office setting where she researched maternal fetal medicine. (Tr. at *id.*, 63). She explained that this position required her to collect a placenta after a mother gave birth, take it to the lab to dissect and freeze a section of it. (Tr. 64-65). It required a lot of standing, waiting around, very fast handiwork, and going to prenatal visits with patients. (Tr. 65). However, this job eventually became too physically demanding because she was unable to stand. (Tr. 35). She recalled having to wheel herself down the hall in a rolling office chair because she could not walk. (Tr. 37). The only thing that relieved her pain was to lay down. (*Id.*).

Shank's most recent position was that of substitute school nurse. (Tr. 37-38, 41). She took this position after believing that she had "overcome the pelvic congestion syndrome" and this was her "attempt once more to change a work environment and get control over [her] hours and [her] lifestyle changes . . . ." (Tr. 38). In this role she earned between $2000 and $4000 per year working approximately six to ten days total. (Tr. 41-42).

10

At one point, Shank started a position as a nurse educator. (Tr. 39). She felt this was a better fit for her because she could be more "asynchronous" with her time, explaining that it was not a 9 to 5 commitment, and that she could work evenings, weekends, or plan ahead to get her job done. (Tr. 39-40). She was only able to perform this role for four and a half years. (Tr. 40). If she had made it to five years, she would have "vested" and could have received a disability benefit, but she could not finish the fifth year. (*Id.*).

At one point, she opened her own consulting business, but she had to close the business. (*Id.*).

During the pandemic, Shank took a desk job with CISD but was removed from the position due to visual problems. (Tr. 42). She recalled that she was responsible for getting people registered to take COVID tests and taking down their names, addresses, and contact information. (Tr. 43). Shank stated that she often got the addresses wrong because she could not see very well. (*Id.*). According to Shank it was not "fruitful" for her to continue working there due to the errors she was making. (Tr. 43-44). She also recalled that the employer was not able to accommodate her due to the effect it had on other employees. (Tr. 44).

Shank explained that part of maintaining her nursing license was only taking assignments that she was qualified to do for the safety of the population she was serving and that of herself. (Tr. 42). There were times that she had to remove herself from the schedule if it were a bad day of pain because she was not physically capable of helping someone. (*Id.*). Carrying a child off of the soccer field, pushing a wheelchair, or performing CPR were examples of tasks that could arise that would be unsafe and too physically demanding. (*Id.*).

Shank worked as a professor at Kent State University for 4.5 years, a nurse practitioner for 4 to 5 years, and a research nurse for 1.2 years. (Tr. 60-61).

Shank testified that she has a congenital eye problem. (Tr. 43). She had double vision and the muscles in her eyes do not work properly causing depth perception and acuity issues. (*Id.*). She has had approximately six surgeries on her eyes. (*Id.*).  The acuity of her vision has always been bad, but she has been able to accommodate it. (Tr. 46). Shank has "given up" trying to find the correct prescription for her vision because her medication makes her vision inconsistent. (*Id.*). However, she felt as though her double vision has gotten worse over the years. (*Id.*). She has had several surgeries to address the double vision which will help for a number of years, but then the double vision reverts back. (*Id.*).

Shank also testified that since 2011 her stomach "just stops and then enlarges the size of like a pregnant full-term . . . ." (Tr. 44). She stated that her stomach would get so big that it stretches out her pelvic floor muscle and her joints making it impossible to do anything other than lie down until the spasm stops. (*Id.*). This also affects her diaphragm. (*Id.*). These episodes last between one and three days. (Tr. 45). According to Shank, she cannot help her body due to dysregulation and dysfunction of her autonomic nervous system at this stage of her disease process. (Tr. 44-45). She stated that it will lead to bowel and bladder incontinences and not being able to move. (Tr. 45).

Shank "explained" pelvic congestion syndrome to the ALJ. (Tr. 53). According to Shank:

> pelvic congestion syndrome is from problems in your vascular system. It could be genetic, it could be from trauma. I believe it was both in my case but there's no way to find out. The pelvic congestion syndrome is kind of like a big balloon if you will if you're standing and then if you're laying flat, you know, like the water balloon would flatten. And so when the balloon in big – it's right next to blood vessels or nerves and so if the balloon is big it hurts, if the balloon in flat it doesn't hurt. So if I stood it hurt, if I was flat the pain would be less or relieved. So I only had like a few good hours in the morning, the rest of the time I had to be recumbent with my legs elevated.

12

(Tr. 53). She had coils inserted in 2006 to treat this. (*Id.*). According to Shank, the doctors at that time were supposed to treat both sides, but only treated her left side. (*Id.*). As a result, all of her physicians assumed her right side had been treated resulting in them having no explanation for why she was having pain. (Tr. 53-54). She did not realize her right side wasn't treated until 2013 or 2014. (Tr. 54). She recalled she later had the right side treated and she had instant relief. (*Id.*). However, since then the coils have gone through her vessel walls. (*Id.*).

Shank explained that she was always told that her pain would pass, she would get better, or that it was in her head. (Tr. 40). She felt as though she was dismissed in many ways. (*Id.*).

The VE testified next. (56). Shank's past work included registered nurse, DOT 075.364-010, medium, skilled, SVP 7; lecturer/visiting professor, DOT 090.227-018, light, skilled, SVP 8; nurse practitioner, DOT 075.264-010, light, skilled, SVP 8; research nurse, DOT 189.117-030, sedentary, performed at light, skilled, SVP 8; school nurse, DOT 075.124-010, light, skilled, SVP 7. (Tr. 58, 65).

According to the VE, a hypothetical individual with the same age, education, and vocational background as Shank who could do light work could perform Shank's past work with the exception of the registered nurse position, which was a medium exertion level. (Tr. 62).

If the hypothetical individual were limited to sedentary work, they could perform Shank's past work of research nurse. (*Id.*). Skills from a nursing job would transfer to a research nurse if in the same area of practice. (Tr. 63-64). There are an estimated 100,000 research nurse jobs in the national economy. (Tr. 66). However, the VE later testified that Shank actually performed the research nurse position at light, but no clarification was made regarding this hypothetical. (Tr. 65).

13

The skills from the research nurse position would transfer to the position of medical record coder, DOT 079.262-014, sedentary, SVP 7, with approximately 25,000 jobs in the national economy; and utilization review coordinator, DOT 079.262-010, sedentary, SVP 7, with approximately 15,000 jobs in the national economy. (Tr. 66-67).

If a third hypothetical individual with the same limitations as the second, with the added limitation that they require three to four unscheduled breaks a day lasting 20 to 30 minutes each in addition to individual breaks, the hypothetical individual would not be able to perform Shank's past work, and such a limitation would be work preclusive. (Tr. 67-68).

The VE testified that her testimony was consistent with the DOT. (Tr. 68). Further, the coding and review coordinator positions were added to the DOT in 1993. (Tr. 69).

## IV.    The ALJ's Decision

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2011, through her date last insured of December 31, 2012 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairment: left pudendal neuropathy (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).

6.    Through the date last insured, the claimant was capable of performing past relevant work as a professor, nurse practitioner, and research nurse. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

14

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2011, the alleged onset date, through December 31, 2012, the date last insured (DLI) (20 CFR 404.1520(f)).

(Tr. 92-102).

## V.   Law & Analysis

### A.   Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.   whether the claimant is engaged in substantial gainful activity;

2.   if not, whether the claimant has a severe impairment or combination of impairments;

3.   if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.   if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.   if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.   Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103

15

(2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-

16

13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc.*
*Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

Shank is proceeding pro se in this matter. As such, this Court liberally construes her
pleadings and arguments. *Franklin v. Rose*, 765 F.2d 82, 84-85 (6th Cir. 1985) ("The appropriate
liberal construction [of pro se pleadings] requires active interpretation in some cases . . . ."). But
even though pro se pleadings are generally held to less stringent standards than those presented
by counsel, liberal construction of pro se pleadings is not without its limits. *Erwin v. Edwards*,
22 F. App'x 579, 580 (6th Cir. 2001). Liberal construction does not require this Court to conjure
allegations on a plaintiff's behalf, and pro se pleadings must provide notice to the opposing party
of the relief sought. *Id.*

### A. Introduction

To begin, the prevailing theme throughout Shank's social security appeal is her
contention that since her DLI she has been formally diagnosed with pelvic congestion syndrome
and that "[r]etrospective diagnoses are particularly relevant in rare, complex conditions like IFI,
PCS, and PN, which are often misunderstood and undetectable with standard tools." (ECF Doc.
18, p. 4). Shank contends that her condition was "static" since 2011 as her doctors tried to rule
out different diagnoses before inevitably diagnosing her with pelvic congestion syndrome, and
that this delay was not due to her own neglect but part of the healthcare system's failure to
identify rare disorders. (*Id.*). As a result, she makes several arguments based on her foundational
assertion that all of the medical evidence post-dating the DLI relates back to her condition pre-
DLI and establishes that she was disabled during the relevant time period of June 1, 2011 to

17

December 31, 2012. (*See, e.g.*, *id.* at pp. 4-7, 8-9, 9-11, 11-13, 13-15, 15-17, 17-18, 19-22, 22-23, 23-24, 24-25, 25-26, 26-27, 28-29).

Extending from this, many of Shank's arguments revolve around her contention that the ALJ erred at numerous points in his analysis with regard to her post-DLI diagnosis and how this Court should remedy that error. Despite the thoroughness of her arguments, this Court's review of the Commissioner's final decision is more limited than Shank requests. I therefore begin this Report and Recommendation with an explanation of the Court's review and a recommendation on whether the ALJ erred in his handling of post-DLI medical evidence.

An ALJ's role is to determine whether the claimant has established entitlement to DIB under the Act, by demonstrating that the claimant was insured at the time of disability and has proven an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). In making this determination, the ALJ employs the sequential five step process outlined above. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs*, 459 F.3d at 642-43.

The claimant bears the burden to establish a disability existing before the expiration of insured status. *Higgs v. Bowen*, 880 F.2d at 862-63; *see also* 42 U.S.C. § 423(c)(1). If disability occurs after the expiration of insured status, the claim must be denied. *See Higgs*, 880 F.2d at 862-63; *see also Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Therefore, only that medical evidence detailing the claimant's condition during the insured time period is relevant when establishing eligibility for DIB. *Forshee v. Comm'r of Soc. Sec.*, No. 11-CV-12339, 2012

18

WL 1672974, at *8 (E.D. Mich. Apr. 11, 2012), *report and recommendation adopted*, 2012 WL 1676645 (E.D. Mich. May 14, 2012).

An ALJ may also rely on medical evidence from outside the relevant time period to establish the existence of an impairment, if that evidence is reasonably proximate in time to the relevant period. *Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir. 1976). Medical evidence postdating the expiration of insured status may be considered insofar as it bears on the claimant's condition during the insured period. *Anderson v. Comm'r of Soc. Sec.*, 440 F. Supp. 2d 696, 699 (E.D. Mich. 2006). But even if an ALJ may consider evidence from outside the relevant time period, an ALJ is not required to assign weight to that evidence. The Sixth Circuit makes clear that "an ALJ makes no such procedural error by declining to give any weight to the opinion of a treating source offered *after* the claimant's date last insured when the opinion does not relate back to the insured period." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851 (6th Cir. 2020) (emphasis in original).

Once the claimant appeals, this Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. A final decision of the Social Security Commissioner made by an ALJ is, however, not reviewed de novo. *Henry v. Comm'r of Soc. Sec.*, 973 F.Supp.2d 796, 801 (N.D. Ohio Sept. 21, 2013).

Here, the ALJ's decision demonstrates that he did review the entire medical record including post-DLI medical records and determined that the post-DLI medical evidence did not relate back to Shank's functionality between June 1, 2011 and December 31, 2012. For example, when the ALJ discussed Shank's alleged impairments he found "there was no evidence supporting these conditions from the alleged onset date until the DLI" and elaborated that post-

DLI medical evidence reaffirmed that pelvic vein compression, Nutcracker syndrome, and superior mesenteric artery compression were not medically determinable impairments. (Tr. 96; *see also* Tr. 98-100 discussing post-DLI medical records in crafting the RFC). In his opinion, the ALJ also found "[i]n a report by Dr. Bradford Fenton, he noted that in 2006 the claimant underwent a vascular procedure, a left ovarian vein embolization. Dr. Fenton stated that based upon subsequent treating notes her pain improved for quite a while. It was not until [August 7,] 2013 that she returned to vascular surgery to discuss her abdominal pain." (Tr. 100; *See also* Tr. 4213). The ALJ found that "[t]he record suggests that it was not until long after her DLI that the claimant began complaining again of debilitating pain." (Tr. 100).

After reviewing the medical record, I find no contemporaneous records that would support her assertion that the post-DLI records should relate back to establish her condition pre-DLI. In fact, the only medical records during the relevant time period between her alleged onset date and the DLI were for a nasal lesion and the results of an allergy test, and Shank makes no arguments related to these being disabling impairments. (Tr. 3573-75, 4389). Accordingly, I do not find error in the ALJ's handling of post-DLI medical evidence given the very limited medical record during the relevant time period. Therefore, I cannot recommend remand on any argument related to the ALJ's handling of post-DLI medical records or diagnoses because the record does not support an argument that the records relate back to the insured period when there are no records indicating the condition was present and limiting the claimant during that period. *Emard*, 953 F.3d at 851.

With this information in mind, I turn to Shank's specific challenges to the ALJ's decision.

**B.  Step Two – Impairments**

In Arguments 1, 13, 14, and 18 Shank takes issue with the ALJ's Step Two findings regarding her impairments.

In the first argument, entitled "Erosion of Occupational Base" Shank claims that "[p]ain is both an impairment and a symptom of other impairments" and that the ALJ "fail[ed] to understand the severity of the impairments and their impacts." (ECF Doc. 18, pp. 2-3). In Arguments 13 and 18, Shank argues that the ALJ erred when he "failed to recognize Pelvic Congestion Syndrome (PCS) as a severe impairment, despite extensive medical documentation and consistent testimony . . . ." (*Id.* at p. 24; *see also id.* at 28). In Argument 14, Shank argues that the ALJ "failed to identify or establish an onset of any condition." (*Id.* at p. 26). In response, the Commissioner argues that the ALJ did not err at Step Two. (*See* ECF Doc. 22, pp. 9-11).

Based on these arguments, I reviewed each of the ALJ's findings with respect to severe, non-severe, and non-medically determinable impairments and find that the ALJ did not err regarding any of his Step Two findings.

The central question at Step Two is whether the claimant has a medically determinable impairment or combination of impairments that substantially limits their ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Claimants must make a *de minimis* showing that their impairment or combination of impairments is severe enough to interfere with their ability to work. *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987). Although the Step Two threshold is "lenient," claimants still must show that their claim is grounded in medical evidence and affected their ability to work prior to the date last insured. *Higgs*, 880 F.2d at 862-63.

However, "'an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment—either singly or in combination with a claimant's other

impairments—does not impose *any* work-related restrictions.'" *Patterson v. Colvin*, No. 5:14-CV-1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015), quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *6 (E.D. Mich. Feb.27, 2015). "Where an ALJ determines that non-severe impairments do not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" *Patterson*, 2015 WL 5560121, at *4, quoting *Hicks v. Comm'r of Soc. Sec.*, No. 12-13581, 2013 WL 3778947, at *3 (E.D. Mich. July 18, 2013).

Here, the ALJ found that Shank had the severe impairment of left pudendal neuropathy. (Tr. 95). The ALJ also found that Shank's strabismus and obstructive sleep apnea were non-severe impairments because "the record showed little evidence of subjective complaints, and no evidence of complications related to these conditions." (*Id.*). Specifically, the ALJ found that Shank had been diagnosed with strabismus in childhood but made no showing in the record that the condition limited her prior to her DLI. (*Id.*). Regarding obstructive sleep apnea, the ALJ similarly found no evidence prior to her DLI indicating the impairment limited her, and that records actually indicated that she was not using a CPAP machine. (*Id.*). Shank does not appear to take issue with respect to these findings in her brief.

The ALJ further determined that based on the records before him, including the post-DLI medical evidence, he could not determine that pelvic vein compression, Nutcracker syndrome, superior mesenteric artery compression, ischiofemoral impingement, affective mood disorder complex regional pain syndrome, or chronic dizziness were medically determinable impairments during the relevant time period of June 1, 2011 through December 31, 2012. (Tr. 96). In support of these determinations, the ALJ cited to the lack of medical evidence demonstrating the

presence of these conditions during the relevant time period. Upon review, I find no error in any of the ALJ's Step Two findings.

As discussed above, Shank's arguments related to the ALJ's alleged failure to find various conditions severe is based upon the voluminous post-DLI medical evidence that she argues establish the existence of those conditions pre-DLI. However, "disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it." *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x. 586, 589 (6th Cir. 2019) (internal citations omitted). The medical record before the ALJ demonstrated that prior to Shank's DLI she sought treatment for lower abdominal pain in 2007 with treatment notes referencing a left ovarian vein embolization in 2006. (*See* Tr. 3512, 4430). In fact, during a December 31, 2008 appointment with Dr. Joseph regarding right side pelvic pain, it was Shank that reported to Dr. Joseph that she was told a 2006 CT scan demonstrated Nutcracker Syndrome and pelvic congestion syndrome. (Tr. 4430). Even though Dr. Joseph concluded that Shank's reported symptoms were consistent with pelvic congestion syndrome, it does not follow that the ALJ erred by stating "there was no evidence supporting [this condition] from the alleged onset date to the DLI." (Tr. 96). The record reflects that, during the relevant time period of June 1, 2011 through December 31, 2012, Shank did not seek or receive any treatment for these conditions. (Tr. 96). The relevant medical record was devoid of evidence and gave no basis for a finding of a medically determinable impairment. Thus, the ALJ did not err in failing to find pelvic congestion syndrome, among other diagnoses, was a medically determinable impairment, despite Dr. Joseph's conclusions in the years before Shank's alleged onset date.

Although a claimant must only make a de minimis showing at Step Two, they still must show that their claim is grounded in medical evidence *and* it affected their ability to work prior

23

to the date last insured, something that Shank has only half-done. *See Higgs*, 880 F.2d at 862-63. When considering the medical evidence from outside the relevant period, Shank has supported her diagnoses. However, there is no evidence during the relevant period to show any effect of her prior diagnoses on her ability to work. Thus, I find that the ALJ's findings are consistent with the limited pre-DLI medical record.

Additionally, assuming without deciding that there could be merit to Shank's argument that pain can both be a symptom and an impairment, I again cannot find error based on the ALJ's Step Two findings given that there are no medical records between June 1, 2011 and December 31, 2012 demonstrating that Shank was suffering from any pain.

Accordingly, I do not find that remand is warranted with respect to the ALJ's Step Two findings and thus do not recommend remand on this basis.

### C.    Step Three – Listings

Shank also raises issues with the ALJ's Step Three findings. In Arguments 3, 11, 12, and 17, Shank argues that the ALJ erred when he failed to find her disabled under various listings. (ECF Doc. 18, pp. 7-8, 22-24, 30).

At Step Three, a claimant has the burden to show that they have an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, they are disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen*, 482 U.S. at 141; *see also Rabbers*, 582 F.3d at 653 ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014), quoting *Sheeks*, 544 F. App'x at 641-42. "Rather, the claimant must point to specific evidence that demonstrates [they] reasonably could meet or equal every requirement of the listing." *Id.* "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Before turning to Shank's substantive listings arguments, I note that Argument 17 entitled "There is no Blue Book" appears to allege that the listings are inaccessible to claimants. (ECF Doc. 18, p. 30 "the Listing of Impairments – referred to by SSA as the 'Blue Book' – is

inaccessible to claimants and their providers."). In this section, Shank challenges the procedures of the Social Security Administration, rather than arguing that the ALJ erred in making his determination. In making this argument, Shank asserts that the listings are "not available as a publication, [she] requested one. [She] was able to identify a few references to 'LISTINGS' on SSA.gov, but was unable to locate criteria for evidence . . . ." (*Id.*). She claims that "[c]ourts recognize this as a problem" but does not provide any legal support for that allegation. (*Id.*). Rather, she cites to cases where courts have discussed listing specific arguments.

Therefore, I cannot recommend remand on the basis of Argument 17. To the extent that Shank argues that the ALJ should have analyzed the Listings differently, I address those arguments below and find no error in the ALJ's decision.

Regarding the ALJ's Step Three listings analysis, Shank argues that "the ALJ failed to conduct any meaningful listing-level analysis. No explanation was given for why Plaintiff's constellation of impairments – including pudendal neuralgia, chronic fatigue, and pelvic disorders – did not meet or equal a listed impairment." (ECF Doc. 18, p. 22).

The ALJ analyzed Step Three as follows:

> The undersigned carefully compared the claimant's signs, symptoms, and laboratory findings with the criteria specified in all of the listing of impairments. The undersigned found no evidence that the claimant had an impairment, or combination of impairments, that met or medically equaled any listed impairment. In particular, the undersigned considered listing 11.14.
>
> As to listing 11.14, the claimant does not have disorganization of motor function or marked limitations in physical functioning or marked limitations one of the four stated areas of mental functioning.

(Tr. 96-97).

Shank further contends that the ALJ's listing 11.14 determination is incorrect, arguing "11.14 does not meet criteria for listing, the ALJ failed to identify for motor nerve dysfunction is

26

located at the terminal end of the nerve, in this neuropathy, it is the pelvic floor, and evidenced by inability to sit, incontinence, dyspareunia and swelling, and spasms." (ECF Doc. 18, p. 30). She also claims that the ALJ failed to address "equivalency under Listing 11.14." (*Id.* at p. 5).

I find no error in the ALJ's Step Three analysis. Despite Shank's argument to the contrary, the ALJ did engage in a meaningful Step Three analysis that allows her and this Court to review and understand his reasoning. Substantial evidence supports the analysis, including his finding regarding Listing 11.14 because the medical evidence during the relevant time did not indicate any disorganization of motor functioning. While Shank argues that other listings could have been analyzed, those arguments related to impairments that the ALJ found non-medically determinable, a decision in which I similarly found no error. I therefore recommend that the District Court affirm the ALJ's Step Three findings.

### D.       Step Four and the RFC

Arguments 2, 6, 9, and 15 each take issue with the ALJ's analysis when crafting the RFC and at Step Four of the five step process.

Before proceeding to Step Four of the sequential analysis, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011), citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p.

27

When determining the RFC, the ALJ is required to "articulate how [they] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At minimum, the ALJ must explain how they considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to agency regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. See 20 C.F.R. § 404.1520c(c)(1)-(2).

### 1.      Post DLI Medical Evidence

In Argument 2, Shank alleges that the post-DLI medical evidence establishes that she was disabled prior to her DLI. (*See e.g.*, ECF Doc. 18, p. 4 ("It is well established that post-DLI medical evidence is admissible when it relates back to a claimant's condition during the insured period.")). While I do not dispute that Shank may have been diagnosed with various conditions, including pelvic compression syndrome, and may very well be struggling with what comes with that diagnosis, that does not necessarily have a bearing on my review of the ALJ's analysis and decision.

As discussed above, the ALJ determined that Shank's only severe impairment was pudendal neuropathy and non-severe impairments of strabismus and obstructive sleep apnea. (Tr. 95). The ALJ determined that based on the records before him, including the post-DLI medical evidence, he could not determine that pelvic vein compression, Nutcracker syndrome, superior mesenteric artery compression, ischiofemoral impingement, affective mood disorder complex

regional pain syndrome, or chronic dizziness were medically determinable impairments during the relevant time period of June 1, 2011 through December 31, 2012. (Tr. 96). In crafting the RFC, the ALJ was only required to consider Shank's medically determinable impairments, both individually and in combination. *See* Soc. Sec. R. 96-8p. As such, there was no error in these conditions not being considered in the RFC analysis.

This finding does not negate the possibility that Shank may presently be suffering from some or all of these conditions; rather, it is specifically responsive to the question before the ALJ – whether Shank was disabled for purposes of DIB between June 1, 2011 and December 31, 2012. I cannot and do not find error in the ALJ's analysis and decision given the medical evidence before him.

In crafting Shank's RFC, the ALJ found that "the record support[ted] a conclusion that the claimant was experiencing mild to somewhat moderate pelvic pain from the 2011 alleged onset date until the December 31, 2012 date last insured." (Tr. 97). I will note that this finding is gracious given the record before the ALJ. While the medical record is voluminous, the vast majority of that record is from after Shank's DLI. Furthermore, after reviewing the record myself, I found that there were no contemporaneous records that indicate Shank complained of pelvic floor symptoms during the relevant period. Rather, there are records from 2007 through 2008 where Shank reported mild or moderate pain that was effectively treated with medication (Tr. 3512, 3517, 3519, 3521, 3534, 3566) and a few records from early- to mid-2011 where she reported either no pelvic pain since giving birth or moderate pain (Tr. 3536, 3566, 3572). The record also contains a January 2011 record for an MR venogram that Shank presented for with complaints of unspecified site abdominal pain and possible pelvic veinous congestion – however there was no indication of Shank's pain level when she reported for the MR venogram. (Tr.

4377). Noticeably absent are records from June 1, 2011, to December 31, 2012 regarding the issue of pelvic or abdominal pain and the related symptoms. Given the record before the ALJ and before this Court for review, while I do not dispute Shank's assertion that post-DLI medical evidence can be instructive, I cannot find error here given the scant evidence during the relevant time for the post-DLI evidence to relate back to. I therefore cannot recommend remand on this basis.

### 2. Subjective symptoms

Shank argues that the ALJ ignored the requirements of SSR 16-3p when crafting the RFC. (ECF Doc. 18, pp. 17-18). Shank contends that "[t]he ALJ acknowledged left pudendal neuralgia as a severe, medically determinable impairment before the DLI . . . but failed to evaluate [her] consistent pain complaints under the proper legal standard." (*Id.* at p. 17).

An ALJ's consideration of a claimant's subjective symptom statements receives great deference on review. It is for the ALJ, not the reviewing court, to judge the consistency of a claimant's statements against the record. *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). Where the ALJ cites legitimate, substantial evidence to support their factual conclusions, this Court may not second-guess. *Id.*, quoting *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012). A plaintiff's contrary conclusion about their own subjective complaints does not meet their burden to demonstrate remand is necessary. *Lipanye*, 802 F. App'x at 171.

When assessing a claimant's subjective statements, the regulations describe a two-part process: "the ALJ must first determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Grames v. Comm'r of Soc. Sec.*, 815 F. App'x 820, 825 (6th Cir. 2019) (internal quotations and

30

marks omitted); *see also* SSR 16-3p, 2017 WL 5180304, *3 (Oct. 25, 2017). In so doing, the ALJ must determine whether there is objective medical evidence from an acceptable medical source showing that the claimant has a medical impairment that could reasonably be expected to produce the alleged pain. 20 C.F.R. § 404.1529(c)(2).

If there is, the ALJ next considers all the evidence to determine the extent to which the pain affects the claimant's ability to work. *Heart v. Comm'r of Soc. Sec.*, 2022 WL 19334605, at *3 (6th Cir. Dec. 8, 2022); *see also* 20 C.F.R. § 404.1529(c)(3). With this, "the ALJ must consider the objective medical evidence and the claimant's reported daily activities, as well as several other factors, to evaluate the intensity, persistence, and functional limitations of the claimant's symptoms." *Grames*, 815 F. App'x at 825; *see also* 20 C.F.R. § 404.1529(c)(1)-(3) *and* SSR 16-3p, 2017 WL 5180304, at *4, *7-8 (Oct. 25, 2017).

Social Security Ruling 16-3p lists the factors relevant to the ALJ's determination of the persuasiveness of a claimant's statements about "the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers*, 486 F.3d at 247. These factors include: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain; and, "[a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2017 WL 5180304, at *7-8; *see, e.g.*, *Morrison v. Comm'r*, No. 16-1360, 2017 WL 4278378, at *4 (6th Cir. Jan. 30, 2017). An ALJ need not expressly address all the factors listed in SSR 16-3p, but they should

sufficiently articulate the assessment of the evidence to assure the reviewing court that the ALJ

considered all relevant evidence. *Cross v. Comm'r*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

SSR 16-3p also instructs an ALJ how to consider a claimant's statements about intensity,

persistence, or functional limiting effects of their symptoms in relation to treatment sought for

those symptoms.

> [I]f the individual fails to follow prescribed treatment that might improve
> symptoms, we may find the alleged intensity and persistence of an individual's
> symptoms are inconsistent with the overall evidence of record. We will not find an
> individual's symptoms inconsistent with the evidence in the record on this basis
> without considering possible reasons he or she may not comply with treatment or
> seek treatment consistent with the degree of his or her complaints. We may need to
> contact the individual regarding the lack of treatment or, at an administrative
> proceeding, ask why he or she has not complied with or sought treatment in a
> manner consistent with his or her complaints.

SSR 16-3p, at *9. "Attempts to obtain treatment may show that symptoms are intense and

persistent; conversely, a lack of such efforts may show that an individual's symptoms are not

intense or persistent." *Jill L. v. Comm'r of Soc. Sec.*, 2023 WL 4757601, at *7 (S.D. Ohio 2023),

citing SSR 16-3p, at *9.

The review in this case must be deferential. A reviewing court "must affirm the ALJ's

decision as long as it is supported by substantial evidence and is in accordance with applicable

law." *Showalter v. Kijakazi,* 2023 WL 2523304, at *2 (6th Cir., Mar. 15, 2023).

Applying that deference in my review, I cannot determine that the ALJ committed

reversible error. The ALJ found that the record supported a conclusion that Shank "was

experiencing mild to sometimes moderate pelvic pain from the time of the 2011 alleged onset

date until the December 31, 2012 date last insured . . . ." (Tr. 97). The ALJ applied the two-step

process outlined in the regulations and in SSR 16-3p. First, the ALJ determined that Shank had

medically determinable impairments including left pudendal neuralgia, strabismus, and

obstructive sleep apnea (Tr. 95). The ALJ then considered all of Shank's own statements about her abilities, describing her testimony and other reports in detail. (Tr. 97-101). The ALJ summarized some of Shank's testimony as follows:

> Her daily life was affected because of her chronic pain. Although she looks normal, she did not behave normally. She was physically exhausted and moving was hard. Her medication caused severe side effects. She stated that her visual problems were getting worse over time. She started changing jobs and had to take a desk job because of the pain just to walk a short distance. This occurred in 2006. In 2012 her son was about 3 ½ years old. She took care of her son, and he was very active. Her husband was working away from home. He was traveling. Her husband did the housework on weekends he was home. They would cook meals together beforehand. She was driving at the end of 2012. She walked to and from the grocery store, but it depended on the day because the pain episodes were inconsistent. If she just had to do light grocery shopping it was okay. She used a swifter because it was light. She left the heavier things for her husband. She was able to contribute to the household, but she had to modify their lifestyles, so it fit her needs. Her kids would help cook but most were prepared ahead of time with her husband. She did laundry but most things were contracted out. Until she found a pain doctor, she was unable to take pain medications.

(Tr. 98). The ALJ also discussed Shank's activities of daily living during the relevant time and found those included "walking to a nearby park with her 3-year-old and taking care of her child. She would walk to and from a nearby grocery store as well and grocery shop as long as it did not require heavy lifting. She did her laundry sometimes and would drive." (Tr. 100).

Based on this, the ALJ determined that Shank's "medically determinable impairments could reasonably be expected to cause the alleged symptoms", but found her "statements about the intensity, persistence, and limiting effects of . . . her symptoms [were] inconsistent because prior to the date last insured [Shank's] pain was only intermittent and mild to moderate in nature." (*Id.*). In reaching his conclusion that Shank's symptoms did not occur with such frequency, duration, or severity as to reduce her residual function capacity beyond light work or to preclude all work activity on a continuing regular basis, the ALJ considered various medical records both pre- and post-DLI including Shank reporting decreased pain and improved

functional activities and rated her pain at zero on a ten-point scale in January 2011 and imaging revealing that her uterus was within normal limits and there was no evidence of fibroids in April 2011. (*Id.*). The ALJ further considered post-DLI medical evidence from August 2013 through December 2017 in support of his findings. (Tr. 98-100).

Based on the ALJ's complete review, spanning several pages, I determine that the ALJ properly considered Shank's subjective symptom statements in accordance with the regulations. This Court may not overturn where the ALJ has made a determination supported with substantial evidence and articulated in a manner that the reviewing court can logically follow, which the ALJ has done here. Although the threshold for substantial evidence is "not high," *Biestek*, 587 U.S. at 102, the standard becomes even more deferential when the court reviews an ALJ's determinations of a claimant's subjective symptoms. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). As such, even though Shank presents evidence that she is more limited, I must defer to the ALJ's consideration of the evidence.

I therefore recommend that the District Court affirm as to Argument 9. The ALJ did not commit reversible error in his evaluation of Shank's subjective symptom statements.

### 3.    Treating Physicians

In her sixth, seventh, and eighth arguments, Shank argues that the ALJ's decision is not supported by substantial evidence because he improperly "discounted," rejected, or failed to analyze various treating source opinions. (*See* ECF Doc. 18, p. 11 "The record contains countervailing evidence from treating physicians without articulation as to if this evidence was misunderstood, or missed altogether, since key findings are not presented in the decision"; p. 13 arguing that the ALJ improperly evaluated post-DLI medical opinions that "offered retrospective assessments tied directly to the pre-DLI period[;]" and p. 15"[t]he ALJ' decision demonstrates a

34

pattern of prejudicial reliance on selected portion of the record while overlooking or minimizing other probative evidence.").

The Commissioner argues that most of the evidence Shank points to with respect to her argument "does not include opinion evidence that the ALJ needed to evaluate under 20 C.F.R. § 404.1520c." (ECF Doc. 22, p. 17). In her reply brief, Shank asserts that "the ALJ rejected longitudinal source data from ongoing providers, not just those pre DLI or those that wrote letters, but those at the top of their skill set where there objective pathology findings speak more than the rest, [and] validated claimant[']s problems since 2011 . . . ." (ECF Doc. 30, p. 7). I agree with the Commissioner.

Shank's arguments relate primarily to her concern present throughout her brief that the ALJ failed to properly consider the post-DLI medical evidence. Having repeatedly found no error in the ALJ's handling of the post-DLI medical evidence, I similarly find these arguments meritless. According to Shank, "[i]f this court, . . . simply aligned the evidence in a timeline format or interpreted the pieces in the decision without medical accuracy, rational conclusion would prevail and justice would stand because there is no substantial evidence in arriving at the decision" of the ALJ. (*Id.* at p. 11). This is not the standard for reviewing an ALJ's determination of medical opinion evidence.

The ALJ must "articulate how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions." 20 C.F.R. § 416.920c, see *Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916, at *5 (N.D. Ohio Feb. 28, 2018). Factors to be considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization;

and (5) other factors. 20 C.F.R. § 416.920c. Supportability and consistency are considered the two most important factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. § 416.920c. Supportability evaluates how well "the objective medical evidence and supporting explanations presented by a medical source" support a medical opinion. 20 C.F.R. § 416.920c(c)(1). Consistency evaluates whether the medical opinion is consistent "with the evidence from other medical sources and nonmedical sources. 20 C.F.R. § 416.920c(c)(2).

With respect to the medical opinions, the ALJ made clear how they were assessed – "Although the record had opinions as to the claimant's functional capacity, these were all after the claimant's DLI and not relevant to this decision . . . . Therefore, the undersigned has not addressed the persuasiveness of these opinions." The record contains numerous medical opinion reports and consultative examination reports, yet none of them were proffered during the relevant period between June 1, 2011, and December 31, 2012, nor did they aver to Shank's condition during that time. (*See* Tr. 3248-55, 3339-44, 3352, 3581-3602, 3917-60, 4198, 4200-01, 4203-4302, 4596, 4598). As such, I find that the ALJ built an accurate and logical bridge between the fact that the treating medical opinions did not relate to Shank's condition during the relevant time period and thus did not require a persuasiveness determination, allowing both Shank and this Court to understand his reasoning.

Regarding Shank's contention that the record contains evidence that she believes supports a disability finding, I find that this is no more than a request for this court to re-weigh the evidence, something it cannot do. "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently . . . and even if substantial evidence also supports the opposite conclusion." *Cutlip v.*

*Sec'y of Health Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal quotations omitted). I decline to engage with Shank's line of reasoning and must recommend the District Court affirm.

### 4.     Medical Expertise

Shank also claims that the ALJ "improperly interpreted radiological findings without any medical qualifications" and that "[b]y substituting his own reading of radiology for that of licensed physicians, the ALJ acted well outside the scope of his adjudicative role." (ECF Doc. 18, p. 19). In response, the Commissioner argues that rather than improperly interpreting medical data, "the ALJ was mostly just summarizing the evidence . . . ." (ECF Doc. 22, p. 21).

While ALJs are charged with making disability determinations, they do "'not have the expertise to make medical judgments.'" *Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 823 (N.D. Ohio Sept. 28, 2009) quoting *Bowman v. Astrue,* No. 3:07CV478–J, 2008 WL 4386869, *3, (W.D. Ky. Sept. 23, 2008); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x. 435, 439 (6th Cir.2010) ("The Social Security Act instructs that the ALJ not a physician ultimately determines a claimant's RFC . . . . An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding.").

Here, the ALJ found that a 2013 "CT of the left renal vein was normal in caliber and not significantly narrowed. The duodenum was not compressed by the superior mesenteric artery." (Tr. 99; *see also* Tr. 96 discussing CT scan with respect to the findings at Step Two.). Notwithstanding my earlier finding that there was no error in the ALJ's handling of post-DLI medical evidence because those records do not relate back to the relevant time period, I further find Shank's argument that the ALJ substituted his own lay opinion for that of a medical professional without merit. In this finding, the ALJ cited to an August 3, 2013 CT scan that was

interpreted by Bohyun J. Kim, M.D. That record states as follows "CT: Again the left renal vein is normal in caliber and is not significantly narrowed. The AP diameter under the superior mesenteric artery measures 5 mm. The duodenum is not compressed by the superior mesenteric artery." (Tr. 4651). There is no evidence that the ALJ improperly interpreted raw medical data, rather the record demonstrates that the ALJ simply referenced Dr. Kim's impression following Shank's CT scan.

### 5.     Non-Exertional limits

In Argument 15, Shank asserts that the RFC is "void" because it fails to include non-exertional limits. (ECF Doc. 18, p. 26). According to Shank, the ALJ should have included non-exertional limits to the RFC "stemming from sensory loss, severe pain, refractory incontinence, or double vision . . . ." (*Id.*).

As has been discussed throughout the opinion and this section, there are very few medical records during the relevant time period. There are no records that demonstrate a need for the non-exertional limits Shank claims the ALJ failed to include. Instead, the ALJ's determination that Shank retained the functional capacity to perform light work due to her moderate pain reported just before the alleged onset date is supported by the record.

Accordingly, I find no reversible error in the RFC or the analysis regarding the RFC or at Step Four. For that reason, I do not recommend remand on Arguments 2, 6, 9, 10, or 15.

### E.     Step Five – Grid

Shank challenges the ALJ's Step Five analysis in Argument 4, arguing "[u]se of the Grids was particularly inappropriate for a younger individual where non-exertional impairments prevent skill transfer and sustained employment." (ECF 18, p. 99). Shank argues that her non-exertional limitations including "restricted upright tolerance, inability to withstand pain of

sitting, incontinence of bladder and bowel, muscle spasms, and required recovery time, and medication side effects . . . were not fully incorporated into the RFC or the vocational expert (VE) hypotheticals" and that "when the non-exertional limits are predominating, there is nothing that exertional strength overcomes . . . ." (*Id.*).

Regarding Shank's statements about her non-exertional limits, I found in RFC section of this Report and Recommendation, that there was no error. I further find no error with respect to the ALJ's Grid determination.

The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2. The Grid includes rules that may be applied "in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work." 20 C.F.R. § 404.1569. The rules "do not cover all possible variations of factors." *Id.* "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Part 404, Subpart P, § 200.00 of Appendix 2. However, "[w]here any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled." *Id.* "In general, where the characteristics of the claimant exactly match the characteristics in one of the rules, the grid determines whether significant numbers of other jobs exist for the person or whether that person is disabled." *Wright v. Massanari,* 321 F.3d 611, 615 (6th Cir. 2003).

According to the Grid Rule 201.23, a younger individual aged 18 to 44 will only meet the Grid for a finding of disabled if they are illiterate and have unskilled or no previous work

experience. 20 C.F.R. Part 404, Subpart P, Appendix 2. Because Shank was a younger individual and had advanced education, she does not meet the Grid for a finding of disability. Therefore I find no error with respect to the ALJ's decision regarding the Grid and do not recommend remand on this basis.

### F. The Administrative Hearing Process

In Argument 5, Shank argues that the ALJ failed to fully develop the record and that it "remained incomplete throughout the adjudicative process." (ECF Doc. 18, pp. 9-11). Similarly, in Argument 16, Shank argues that the ALJ erred when he "prematurely ended proceedings and refused to allow [her] to raise concerns about missing evidence and unaddressed impairments . . . ." (*Id.* at p. 27). She also argues that she was not given access to her case file and that the record was incomplete. (*Id.*; *see also id.* at p. 10). According to Shank, "[t]he SSA is obligated to assist unrepresented or disadvantaged claimants in obtaining and developing relevant evidence" and the ALJ's failure "to assist in developing the record and to respond to repeated procedural concerns left [her] unable to meet her burden of proof through no fault of her own." (*Id.* at p. 28). In support of her argument, Shank relies on various HALLEX and POMS provisions.

Due process requires that social security proceedings be "full and fair," and it falls on the ALJ to ensure every claimant receives a full and fair hearing. *Flatford v. Chater*, 93 F.3d 1296, 1305 (6th Cir. 1996); *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). Consequently, the ALJ has an affirmative duty to develop the record. *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 262 (6th Cir. 2015). But the burden is nevertheless on the claimant to provide a complete record. *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003); *see also Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).

The ALJ's duty to fully develop the record is heightened in special circumstances, such as "when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008). Once the heightened duty arises, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Lashley*, 708 F.2d at 1052 (quotation marks and citations omitted). There is no bright-line test for determining when the ALJ has adequately discharged his duty, such that the determination must be made on a case-by-case basis. *Id.*

While Shank is correct that an ALJ would have a heightened duty to develop the record of an unrepresented or disadvantaged claimant, this does not apply to her case. At the hearing level, she was represented by counsel who did not object to the completeness of the record when asked. (*See* Tr. 28-29). Furthermore, Shank has not demonstrated how the record was inadequate. She does not demonstrate what was missing from the record, rather she takes issue with the procedure employed by the ALJ in collecting the record. (*See e.g.*, ECF Doc. 18, p. 27 "When the ALJ admitted evidence into the record, he failed to confirm that Plaintiff had reviewed it in advance, contrary to the procedure mandated in HALLEX HA 01260.058(c)."). As mentioned, Shank supports her arguments with citations to HALLEX and POMS. This reliance in support of her arguments is unavailing.

Although HALLEX describes policies ALJs should follow when conducting hearings and reviewing a claimant's case, HALLEX's procedural guidance is not binding on this court. *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008); *Workman v. Comm'r of Soc. Sec.*, No. 3:20-CV-01821, 2021 WL 8342810, at *12 (N.D. Ohio Nov. 15, 2021); *Robberts v.*

*Comm'r of Soc. Sec.*, No. 2:18-cv-541, 2019 WL 4023549, at *7 (S.D. Ohio Aug. 26, 2019) ("Importantly, HALLEX is an internal guidance tool that does not have the force of law . . . . Indeed, HALLEX does not impose judicially enforceable duties on either the ALJ or this Court."). POMS similarly does not have the force of law. *Davis v. Sec'y of Health & Human Servs.,* 867 F.2d 336, 340 (6th Cir. 1989) ("the POMS is a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law").

Nor do procedural due process rights arise from HALLEX violations alone. *See Eboch v. Comm'r of Soc. Sec.*, No. 5:12-cv-649, 2012 WL 7809080, at *4 (N.D. Ohio Dec. 13, 2012), *report and recommendation adopted*, 2013 WL 1284353 (N.D. Ohio Mar. 27, 2013) ("[A]gency procedures set forth in HALLEX may embody, but do not *create* federal due process rights for claimants.") (emphasis in original). Indeed, "[n]o circuit has held that . . . HALLEX creates *constitutional rights* because, of course, only the Constitution, not an agency's rules or procedures, is the source of such rights." *Dukes v. Comm'r of Soc. Sec.*, No. 1:10-cv-436, 2011 WL 4374557, at *9 (W.D. Mich. Sept. 19, 2011) quoting *Davenport v. Astrue*, 417 F. App'x 544, 547-48 (7th Cir. 2011) (emphasis in original).

Because Shank was represented at the hearing and has not demonstrated how the record was incomplete on appeal to this Court, I do not recommend the case be remanded on this basis.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Shank's application for DIB be affirmed.

Dated: September 22, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).